UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ACE-SAGINAW, PAVING CO.,

        Plaintiff,

                                 Case No. 23-CV-11092

vs.

                                 HON. GEORGE CARAM STEEH

OPERATING ENGINEERS' LOCAL
324 PENSION FUND,

        Defendant.

and

TRUSTEES OF THE OPERATING
ENGINEERS' LOCAL 324
PENSION FUND,

        Plaintiffs,

vs.

EDW. C. LEVY CO., d/b/a
ACE-SAGINAW, PAVING CO.,

        Defendant.
_____/

OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART OPERATING ENGINEERS' LOCAL 324 PENSION
FUND'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 17)
AND GRANTING IN PART AND DENYING IN PART
ACE-SAGINAW'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 18)

- 1 -

This action arises from a dispute between Ace-Saginaw Paving Company (Ace or Employer) and the Operating Engineers' Local 324 Pension Fund (Fund) involving withdrawal liability assessed against Ace for its partial withdrawal from the Fund. Ace demanded arbitration pursuant to ERISA § 4221(a)(1), 29 U.S.C. § 1401(a)(1) and the Arbitrator issued his Award on April 10, 2023. On May 9, 2023, Ace filed a lawsuit seeking to enforce and modify the Arbitrator's Award (ECF No. 1), and the Fund filed a lawsuit seeking to vacate the Award (Case No. 23-11096, ECF No. 1). The cases have been consolidated under Case No. 23-11092 (ECF No. 9). The matter is before the Court on cross-motions for summary judgment.

## BACKGROUND

## I.    Legal Background

Private pension plans, including multiemployer plans, are regulated by the Employee Retirement Income Security Act of 1974, as amended (ERISA) and modified by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). 29 U.S.C. § 1001 et seq. Multiemployer pension plans are considered "defined benefit plans." *Sofco Erectors, Inc. v. Trustees of Ohio Operating Engineers Pension Fund*, 15 F.4th 407, 418 (6th Cir. 2021) (citing *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*

*For S. Cal.*, 508 U.S. 602, 607 (1993)). Such plans guaranty a certain monthly benefit to be paid to beneficiaries in the future as a pension. The plans are responsible for establishing a formula that determines the monthly pension benefit. *Id*. (citation omitted). Future benefit payments and administrative expenses are paid from employer contributions to the fund plus the investment income generated from the contributions.

Pension funds use actuaries to assist in determining a fund's future liabilities. Factors that influence future liabilities include how many employees will vest their benefits, how much they will receive in benefits, and how long they will live. Once the actuary determines how much the pension fund will need to spend on benefit payments and administrative costs, it determines the present value of these future liabilities.

Because the factors that influence this calculation are unknown, the actuary must make certain assumptions about the income the fund's assets will generate. One such assumption is the interest rate to be employed. If the actuary assumes the fund's investments will have a higher long-term growth rate, then the fund will not need as much money today to pay its future liabilities. The converse is that the lower the interest rate assumption, the more money the fund needs today to avoid an unfunded liability in the

future. *Id*. at 419. Two different interest rate assumptions are referred to by the parties in this case.

Pension funds are statutorily required to have a certain amount of assets to pay their future liabilities, known as minimum funding. *See* 26 U.S.C. §§ 412, 431; 29 U.S.C. §§ 1082, 1084. An interest-rate assumption is required to discount future liabilities to present value for minimum funding purposes. If funds fall below a certain level, employers contributing to the fund may be taxed. A higher interest-rate assumption is more favorable to the fund because it makes it easier to meet minimum-funding standards.

When an employer withdraws from a multiemployer plan, the plan's contribution base is reduced. However, the plan must still honor its obligations to past liabilities generated by the exiting employers. To address the potential consequences associated with employer withdrawal, the MPPAA provides for withdrawal liability. This liability is a one-time settlement amount assessed against the withdrawing employer to ensure that there will be sufficient money available to cover future pension benefits. It is no surprise that the interest rate assumption is crucial to calculating withdrawal-liability. Because withdrawal liability is final on the date an employer is assessed, if the actuary's assumptions turn out to be

incorrect, for example if the fund's investment returns are less than the interest rate employed, the fund cannot recover those losses from the withdrawn employer in the future.

## II.   Factual and Procedural Background

Defendant Fund is a multiemployer pension plan. In 2018, Ace terminated its collective bargaining agreement with the Fund, incurring a partial withdraw pursuant to 29 U.S.C. § 1385. The dispute between the parties relates to the interest rate assumption the Fund used to calculate Ace's withdrawal liability.

Prior to 2011, the Fund's actuary used the same interest rate assumption of 7.75 percent for its minimum funding calculations as well as for its withdrawal liability calculations. In 2011, the Fund changed its actuary to Horizon. Horizon maintained the 7.75 percent interest rate for minimum funding purposes but adopted the Pension Benefit Guaranty Corporation (PBGC) interest rate of 2.27 percent for calculating withdrawal liability. Prior to the interest rate change, the Fund's unfunded vested benefit liabilities were $600 million. After the change to the withdrawal liability interest rate assumption, the unfunded vested benefit liabilities were $1.6 billion.

Reducing the interest rate assumption for calculating withdrawal liability from 7.75 percent to 2.27 percent significantly impacted the withdrawal liability assessment for Ace. On September 22, 2020, the Fund sent Ace a Notice of Partial Withdrawal and Demand for Payment of Withdrawal Liability in the amount of $16,386,924.00. Ace pursued review of the assessment through the mandatory arbitration process. Ace raised three issues in arbitration:

(1)     Whether the Fund and its actuary violated 29 U.S.C. § 1393 by applying an interest rate assumption that is not the best estimate of the anticipated experience under the plan, taking into account all other assumptions, including the asset allocation of the plan and the plan's investment policy.

(2)     Whether the Fund can rebut the presumption that using the PBGC interest rate is unreasonable for calculating withdrawal liability because it is significantly lower than the Plan's assumed interest rate used for valuation.

(3)     Whether the Fund violated 29 U.S.C. § 1394(b) by failing to provide notice to employers of the change in the withdrawal liability interest rate assumption.

Arbitrator Michael McDowell held a hearing on October 6 and 7, 2022. The Arbitrator considered the critical evidence to include Fund documents and the testimony and documentation provided by the Fund's Enrolled Actuary, Jonathan Feldman. On April 10, 2023, the Arbitrator issued his Award, finding that the Employer demonstrated by a

preponderance of the evidence that the actuarial assumptions and methods used by the Fund actuary, specifically the use of the PBGC interest rate for calculating withdrawal liability, was in the aggregate unreasonable. The Arbitrator permitted the Fund to make a new determination of the partial withdrawal liability and interest rate assumption based on the "Fund's actual characteristics taking into account reasonable expectations including expected returns on the Fund's investments." (Award at p. 42). The Fund's actuary did not re-determine the withdrawal liability interest rate assumption.

The parties both appeal this part of the Arbitrator's Award. Ace asks the Court to enforce the Arbitrator's decision that the withdrawal liability assessment should be vacated but seeks a modification that its partial withdrawal liability be calculated using the 7.75 percent interest rate assumption that was previously employed. Ace contends this would reduce its partial withdrawal liability from the $16,386,924 assessed by the Fund to $6,297,833. The Fund argues that the Award should be vacated because the Arbitrator erred in finding that Ace met its burden of demonstrating by a preponderance of the evidence that the actuary's use of the PBGC interest rate was unreasonable. The Fund maintains Feldman's selection of the

PBGC interest rate was his best estimate based on the Fund's experiences and the reasonable expectations regarding those experiences, including the Fund's current investments.

The Arbitrator also found that the Fund violated § 1394(b) by failing to provide notice to Ace of the change to the withdrawal liability interest rate, which affected the withdraw liability calculation. However, the Arbitrator concluded that Ace was aware of the interest rate change as early as 2016 and did not take any action based on that information until it requested review of the withdraw liability assessment. Because Ace failed to show it was prejudiced by the Fund's notice violation, the Arbitrator did not award a remedy to Ace.

The parties both appeal this part of the Arbitration Award as well. The Fund contends that the actuary's change of the interest rate assumption is not a plan rule or amendment adopted or determined by the Trustees, so notice was not required under § 1394. Ace agrees with the Arbitrator that the Fund violated the notice requirement but argues that the Arbitrator erred in not awarding a penalty for the violation.

## STANDARD OF REVIEW

Judicial review of an arbitrator's determination is provided by the MPPAA and is extremely narrow. 29 U.S.C. § 1401(b)(2). Pursuant to the MPPAA, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C. § 1401(c). Courts must give great deference to an arbitrator's determination because of the MPPAA's strong policy favoring arbitration of withdrawal liability disputes." *Sherwin-Williams Co. v. New York State Teamsters Conf. Pension, Ret. Fund*, 158 F.3d 387, 392 (6th Cir. 1998) (citation omitted). Deference to the findings of the arbitrator is also appropriate "because the arbitrators chosen to resolve the complicated issue of withdrawal liability often have relevant expertise in the field of pension law which can contribute significantly to the accuracy of a decision." *Id*. at 393 (citation omitted). Therefore, courts review an arbitrator's findings of fact under the "clearly erroneous" standard. *Sherwin-Williams Co. v. New York State Teamsters Conf. Pension, Ret. Fund*, 969 F.Supp. 465 (N.D. Ohio 1997). To reverse under this standard, the reviewing court, based on the entire record, must be left with the definite and firm conviction that a mistake has been committed. *Id*. at 471-72.

While an arbitrator's findings of fact are presumed to be correct,

questions of law, including statutory interpretations, are reviewed *de novo*.

*Id.*

## ANALYSIS

## I.   Issue One: Withdrawal Liability Interest Rate Assumption

### A.   Employer's Burden of Proof in Arbitration

Disputes between an employer and the plan sponsor concerning a

determination made under § 4201 through § 4219 are to be resolved

through arbitration. As it relates to the calculation of withdrawal liability, the

determination of a plan's unfunded vested benefits is presumed correct,

though the presumption may be rebutted by an employer showing by a

preponderance of the evidence that "the actuarial assumptions and

methods used in the determination were, in the aggregate, unreasonable

(taking into account the experience of the plan and reasonable

expectations)[.]" 29 U.S.C. § 1401(a)(3)(B)(i). To overcome the

presumption, it is the employer's burden to "show that the combination of

methods and assumptions employed in the calculation would not have

been acceptable to a reasonable actuary." *Concrete Pipe & Prods. v.

Constr. Laborers Pension Tr.*, 508 U.S. 602, 635 (1993).

**B.     Statutory Standard**

ERISA requires that an actuary calculating withdrawal liability use "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1). The Sixth Circuit has held that this is a substantive standard the plan actuary must adhere to in making the interest rate assumption. *Sofco*, 15 F.4th at 421-22.

**C.     Fund Actuary's Selection of PBGC Interest Rate**

In Issue One, Ace challenged the actuary's interest rate assumption in arbitration on the basis that it was not "the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1391(a)(1).

The Arbitrator considered Feldman's testimony as well as documentary evidence. The Arbitrator determined Feldman's March 9, 2012 and May 14, 2019 memos to the Board of Trustees to be the most credible evidence of the factors Feldman considered and his reasons supporting his withdrawal liability interest rate assumption. The March 9, 2012 memo was the most contemporaneous explanation for the withdrawal

liability interest rate change in 2011. In that memo, Feldman explained he believed changing the interest rate assumption from 7.75% to the PBGC rate was "in the best interest of the Plan, its participants and participating employers." The Arbitrator found this evidence to be significant and contrary to ERISA, which requires the actuary to make his "best estimate of anticipated experience under the plan." 29 U.S.C. § 1393.

PBGC interest rates are annuity rates used to determine the present value of future liabilities for plans that are terminated by a "mass withdraw," which occurs when all employers completely withdraw from a multiemployer plan. *Sofco*, 15 F.4th at 420 (citing ERISA statutes and regulations and explaining that "[w]hen a plan undergoes a mass withdrawal the plan must purchase annuities to cover the promised benefits unless the plan assets can be distributed 'in full satisfaction' of all covered benefits."). The Arbitrator found it to be significant that this Fund has 61 percent of its assets allocated to equities and no money is allocated to annuities or U.S. government bonds.

Feldman testified that he chose the PBGC interest rate for withdrawal liability based on various characteristics of the Fund including, but not limited to, its past and anticipated portfolio experience. Feldman justified

the PBGC interest rate as his best estimate of anticipated experience for this Fund due to the dire outlook for the Fund and the fact that withdrawal liability is a final settlement. He further testified that he used different rates for different plans depending on each plan's unique characteristics. Feldman invoked actuarial standards, including that his assumptions should be upheld if they fall into a range of reasonableness such that they would be acceptable to a reasonable actuary.

Feldman testified that various characteristics and experiences of the Fund led him to conclude that the PBGC interest rate reflected his best estimate of the anticipated experience of the Fund. Overall, his view was that the Fund was not healthy. He considered that the Fund was in the critical zone and had adopted a Rehabilitation Plan that increased contributions and reduced benefits. He also considered that the Fund is mature and highly leveraged, with the bulk of liabilities being for people who are no longer working. He explained that the ratio of active to inactive participants has declined. As such, Feldman concluded that the Fund is less able to withstand risk. Feldman also looked at past investment returns and future anticipated investment returns based on the Fund's investment portfolio.

Feldman explained that his methodology for calculating the anticipated experience is different for minimum funding than it is for withdrawal liability. This is because minimum funding is an ongoing budgeting task, where factors such as the interest rate, asset portfolio and contributions can change over time. With withdrawal liability, once the number is set it can never be changed. Therefore, he endeavored to choose an interest rate assumption with a high probability of meeting the return so the assessment would cover the withdrawing employer's portion of the unfunded liability in the future.

The Sixth Circuit has held that an actuary is not permitted to dilute his or her best estimate of a plan's anticipated experience by employing an interest rate on investments the plan is not required to and might never buy. In *Sofco*, the Court instructed that the actuary may not use a discount rate implicit in annuity prices or other settlement options to measure the plan's present value of benefits in every scenario because ERISA requires the actuary to choose a rate that reflects "anticipated experience under the plan." 15 F.4th at 422-23.

The Ninth Circuit recently rejected a plan's use of the PBGC interest rate as unreasonable under Section 1393 because it was not the actuary's

best estimate of anticipated experience under the plan. *GCIU-Employer Retirement Fund v. MNG Enterprises*, 51 F. 4th 1092 (9th Cir. 2022). Relying on the Sixth Circuit's decision in *Sofco*, the Ninth Circuit stated, "[b]y ignoring the expected returns of the plan's assets and experience, the actuary's estimate fell short of the statutory "best estimate" standard because it was not tailored to the features of the plan…" *Id*. at 1099.

The D.C. Circuit Court has also held that the actuary's best estimate of anticipated experience under the plan "requires the actuary to use a discount rate assumption based on the plan's actual investments" … and "it cannot be divorced from the plan's anticipated investment returns" on those actual assets. *United Mine Workers of Amer. v. Energy West Mining Co.*, 39 F. 4th 730, 740 (D.C. Cir. 2022). While not binding on this Court, *Energy West* is instructive because the coal fund involved in that case was also in a dire financial condition. Moreover, the coal mining industry had been in decline for decades for various reasons with employers and active workers steadily decreasing. Yet, the D.C. Circuit found none of the plan's demographic factors to be relevant to the interest rate assumption to be chosen under Section 1393.

The D.C. Circuit emphasized that "Congress directed what the actuary must estimate when making assumptions used to calculate withdrawal liability, namely a plan's anticipated future liabilities and asset returns. Such predictions necessarily turn on a plan's characteristics." *Id*. at 738. Furthermore, '[a]s applied to the discount rate assumption, using the plan's particular characteristics means the actuary must estimate how much interest the plan's assets will earn based on their anticipated rate of return." *Id*. "In sum, the MPPAA's rule that the actuary use assumptions 'which, in combination, offer the actuary's best estimate of anticipated experience under the plan' requires the actuary to choose the discount rate assumption based on the plan's actual investments." *Id*. at 740.

In his testimony before the Arbitrator, Feldman explained that he relied on the Horizon 2018 Survey of Capital Market Assumptions (Survey) in determining the anticipated experience of the Fund's asset allocation. In the Survey, Horizon's plan advisors projected a 45.1% probability of exceeding a 7.75% rate of return over 20 years. Feldman acknowledged this is close to the risk-neutral 50%. In contrast, the Survey stated that over a 10-year timeframe for a conservative investor there was a 76.7% probability that this Fund would meet or exceed the PBGC interest rate. *Id*.

Feldman also looked at the investment policy of the Fund's Trustees, which projected a high probability of the Fund meeting the 7.75% return in investment over a 30-year period. (Arbitration Award p. 35 citing Transcript 97-98).

Other evidence before the Arbitrator included the 2018 Schedule MB that Feldman prepared for this Fund for minimum funding purposes. Feldman certified that his best estimate of anticipated experience under the plan was 7.75% "net investment return for the Plan assets over the long term." In making his estimate, Feldman took into account the asset allocation mix set forth in the Board of Trustee's Investment Policy along with the experience of the plan and reasonable expectations. The Investment Policy consists of an asset allocation that includes: 61 percent in total equities, 24 percent in total fixed income, 14 percent in real assets and 1 percent in hedge fund investments. While the 2018 Schedule MB was prepared for minimum funding purposes as opposed to the withdrawal liability interest rate assumption, it does have some relevance because it is based on the assets held by the Plan.

Feldman also testified that he considered the Fund's past performance. The Fund's investment consultant, NEPC, reported that from

the plan's inception in 1984 to 2018, the Fund achieved an 8.2 percent annualized investment return.

The Arbitrator considered the same evidence as Feldman but gave greater weight to the evaluation of the Fund's past and future anticipated performance than the PBGC's 2.27% "riskless" annuity rate. This is what ERISA requires where the Fund's investment portfolio contains "no Fund assets in US Government Securities, annuities or other assets for which the returns are governed by the PBGC interest rates." (Award p. 20, 33).

Feldman offers two other arguments to support his selection of the PBGC interest rate assumption. First is that he invoked the Actuarial Standards of Practices (ASOP) in choosing the withdrawal liability interest rate. ASOP 27 permits the actuary to use a discount rate that either: "(1) reflects the anticipated investment return under the plan or (2) a discount rate implicit in annuity prices or defeasance or settlement options." ASOP 27, §§ 3.9 (a) & (b). Feldman justified using the PBGC annuity discount rate under the second alternative because withdrawal liability is a final settlement. He reasoned that the PBGC rate is within the range of reasonable settlement rates to choose from as it is the government's best

estimate of the settlement rate for annuities, and using a near riskless rate

makes sense because once the employer withdraws it avoids all future risk.

When the Sixth Circuit considered a similar argument in *Sofco*, it first

recognized that "ERISA does not yield to the Actuarial Standards of

Practice; the standards must succumb to the statutory requirements."

*Sofco*, 15 F.4th at 423. While ASOP 27 offers actuaries two alternatives for

selecting a discount interest rate for withdrawal liability, only the first

conforms with ERISA: "[t]he actuary may use a discount rate that reflects

the anticipated investment return from the pension fund." *Id*. The *Sofco*

Court rejected the Fund's argument that the actuary's interest rate

assumption, which was based on investments the Fund did not own, was

reasonable because it would have been acceptable to a reasonable

actuary employing actuarial standards. The Court emphasized that ERISA

controls what the actuary may project, so the actuary is limited to using a

discount interest rate assumption that reflects the anticipated experience

under the plan. *Id*. Significantly, the Court equated ERISA's requirements

with ASOP 27's language that the withdrawal liability interest rate must

reflect "anticipated investment return from the pension fund." *Id*.

Lastly, Feldman justified the use of the PBGC interest rate as reasonable because it transfers the risk from the Fund to the withdrawing employer. His risk transfer theory is based on the premise that employers who participate in a plan have a different experience than withdrawing employers because they continue to bear the risk for purposes of funding. The theory accounts for the fact that the withdrawing employer no longer participates in the experience of the plan in setting assumptions for withdrawal liability.

The *Sofco* Court considered and rejected the risk transfer justification:

> Perhaps this [risk transfer claim] is a laudable policy proposal. But, even if it is, we see no indication in the statute that Congress adopted it. ERISA does incorporate a risk shifting regime for mass withdrawals, which the statute does treat as a 'settlement.'. . . But there is nothing in the statutory text to indicate that ERISA adopted a similar regime for individual withdrawals from multiemployer plans. Nor can we find any suggestion that Congress intended to give an actuary the discretion to dilute her best estimate of anticipated experience under the plan in order to shift risk onto the departing employer."

*Sofco*, 15 F.4th at 422.

The Fund argues that the risk transfer analysis in *Sofco* was a policy argument which does not constrain Feldman because he based his analysis on the Fund's unique characteristics. However, the other factors

that Feldman considered to support his selection of a nearly riskless

interest rate assumption are not supported by ERISA, its regulations, or this

Circuit's interpretation of the statute. *See id*. at 422.

### D.   Conclusion

As set forth above, the PBGC interest rates do not offer the actuary's

best estimate of anticipated experience under this Plan, as required by 29

U.S.C. § 1393(a)(1). The Court finds that the Arbitrator did not err in

concluding that the Employer proved by a preponderance of the evidence

that the Fund actuary's use of the PBGC interest rate assumption in

calculating the Employer's withdrawal liability was in the aggregate

unreasonable.

The Arbitrator remanded the matter to the Fund so the actuary can

recalculate the Employer's withdrawal liability consistent with statutory

requirements of 29 U.S.C. § 1393(a). Ace argues that the Fund waived its

right to come up with a new interest rate by not doing so as directed by the

Arbitrator, instead filing its motion to vacate the Arbitration Award. Ace cites

to *United States v. Montgomery*, 998 F.3d 693, 697-99 (6th Cir. 2021),

discussing waiver as the intentional relinquishment or abandonment of a

known right in the context of criminal law. Ace thus urges the Court to order

the Fund to recalculate the partial withdrawal liability using the Fund's former 7.75% interest rate.

The criminal case cited by Ace does not support the conclusion that the Fund relinquished or abandoned its right to have its actuary determine the interest rate assumption. ERISA requires that the interest rate be "the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393. This is an actuarial task that belongs to the Fund's actuary. As such, the Court affirms the Arbitration Award as to Issue One, including remand to the Fund for a new determination of partial withdrawal liability and 60 days for review by Ace.

## II.    Issue Two: Presumption Regarding Interest Rate Assumption

The second issue Ace raised in arbitration is whether the Fund rebutted by clear and convincing evidence that the PBGC interest rate for calculating withdrawal liability is presumptively unreasonable and unlawful because it is significantly lower than the Plan's assumed rate of 7.75% for valuation. The Arbitrator determined it was not necessary to address this issue after concluding that the assumptions and methods used by the actuary in choosing the PBGC interest rate for withdrawal liability were unreasonable and did not comply with ERISA standards.

Because the Court affirms the Arbitrator's determination on Issue

One, it also need not address Issue Two.

## III.   Issue Three: Fund's Lack of Notice of Interest Rate Change

In Issue Three, Ace asserts that the Fund's failure to provide notice of

its significant interest rate change for withdrawal liability to the Fund's

employers violates MPPAA 29 U.S.C. § 1394(b). That section provides:

> The plan sponsor shall give notice to all employers who have
> an obligation to contribute under the plan and to all employee
> organizations representing employees covered under the plan
> of any plan rules or amendments adopted pursuant to this
> section.

The issue is whether changing an interest rate assumption is a "plan rule or

amendment" adopted pursuant to this section.

The phrase "plan rule or amendment" does not appear to be defined

in the statute. The Arbitrator looked to the legislative history, which states

that "when a plan rule or amendment affects withdrawal liability, the plan

sponsor is required to give notice of the adoption of the rule or amendment

. . . . (Award p. 39). The Arbitrator reasoned that the change to the interest

rate assumption in this case significantly affected withdrawal liability of any

contributing employer choosing to withdrawal from the Fund. The Arbitrator

concluded that the Fund violated 1394(b) when it failed to provide notice to

the Employer of the decision to change the discount rate it applied to UVBs from 7.75% to the PBGC rate.

However, the legislative history simply uses the phrase "plan rule or amendment" but does not provide a definition. Ace has not cited any statute or caselaw to support that an interest rate assumption is a plan rule or amendment. The withdrawal liability interest rate assumption is not drafted, created, or adopted by the Trustees. It is simply an actuarial assumption. The interest rate assumption is not included in the plan document, which would bring it under the purview of 1394(b) as it would take a plan amendment to change. Nor is the interest rate assumption a rule – it is a variable that must be "reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 USC 1393(a)(1).

The Arbitrator erred in concluding that the Fund violated the notice requirement of 29 U.S.C. § 1394(b). Therefore, the Court vacates the Arbitrator's finding that the Fund violated 29 U.S.C. § 1394(b) when it failed to provide notice to Ace of its change to the interest rate assumption for withdrawal liability.

<u>CONCLUSION</u>

For the reasons stated above,

IT IS HEREBY ORDERED that The Fund's motion for summary judgment (ECF No. 17) is GRANTED in part and DENIED in part.

IT IS HEREBY FURTHER ORDERED that Ace's motion for summary judgment (ECF No. 18) is GRANTED in part and DENIED in part.

IT IS HEREBY FURTHER ORDERED that the Arbitration Award is VACATED as to Issue Three (notice requirement) and AFFIRMED and ENFORCED in all other respects consistent with this Opinion and Order.

So ordered.

Dated:  March 20, 2024

<u>s/George Caram Steeh</u>
HON. GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record
on March 20, 2024, by electronic and/or ordinary mail.

<u>s/Lashawn Saulsberry</u>
Deputy Clerk

---